**VACATION BREAK U.S.A., INC., Plaintiff,**

v.

**MARKETING RESPONSE GROUP & LASER COMPANY, INC., et. al. Defendants.**

**No. 8:98–CV–1150–T–17MAP.**

United States District Court, M.D. Florida, Tampa Division.

March 26, 2001.

F. Wallace Pope, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Clearwater, FL, Richard W. Epstein, Glen Rafkin, Greenspoon, Marder, Hirschfeld, Rafkin, Ross & Berger, Ft. Lauderdale, FL, for Plaintiff.

John R. Bush, William B. Bowles, Jr., Bush, Ross, Gardner, Warren & Rudy, P.A., Tampa, FL, Michael D. Allweiss, All-

weiss & Mensh, MacIntosh, Allweis & Bursa, St. Petersburg, FL, for Defendants.

H. Michael Evans, Clearwater, FL, for Movant.

Elise LaTorre, Delray Beach, FL, for Pro se.

## *ORDER*

KOVACHEVICH, Chief Judge.

THIS CAUSE is before the Court on Plaintiff's Motion for Summary Judgment, (Dkt.173), filed on September 6, 2000.

### I. *Background*

The following factual allegations are taken from Plaintiff's Amended Complaint. (Dkt.49). On April 15, 1999, Plaintiff filed an Amended Complaint against twelve named Defendants. Plaintiff is the developer and operator of various timeshare resort properties. Plaintiff has, at all times material hereto, engaged in direct mail solicitation in order to obtain prospective timeshare purchasers. Defendants provided printing, mailing products, and services to be used in the direct marketing of various goods and services to Plaintiff.

In November 1995, Plaintiff entered into a Sales and Marketing Agreement with Defendants. This Sales and Marketing Agreement arranged for Defendants to provide printing and mailing services to Plaintiff. The Sales and Marketing Agreement also contained a promise by Defendants to provide Plaintiff with lead lists. The lead lists that were, allegedly, to be provided to Plaintiff contained the names of individuals who were likely to respond favorably to the marketing of travel packages and timeshare interests. Defendants were, allegedly, the only company available to supply Plaintiff with the components of the combined products and services, in the volume Plaintiff required.

Less than six months after Plaintiff and Defendants entered into the Sales and

Marketing Agreement, Plaintiff suspended its business relationship with Defendants. Thereafter, on March 24, 1997, Defendants brought suit against Plaintiff in the Circuit Court for the Sixth Judicial Circuit for Pinellas County, Florida. Defendants' state court suit asserted two claims against Plaintiff, under the Florida Antitrust Act of 1980, Fla. Stat. § 542.18. The state court suit was the consequence of: 1) an alleged group boycott organized by Plaintiff; and 2) the uniform fixed purchase price that Plaintiff and other vacation certificate clients imposed on Defendants, pursuant to a 1995 Sales and Marketing Agreement. Defendants further alleged in the state court suit that Plaintiff used the lead lists, provided by Defendants, in violation of the Sales and Marketing Agreement and agreed to drive Defendants out of business.

On June 2, 1998, Plaintiff initiated this cause of action, which seeks damages against the twelve named Defendants, under Sections three and four of the Clayton Act, 15 U.S.C. §§ 14 and 15(a), and Sections one (1) and two (2) of the Sherman Act, 15 U.S.C. § 1. Defendants allegedly:

> Illegally required [Plaintiff to], in order to purchase rights to use Defendants' perceived highly desirable lead lists, exclusively contract with Defendants for creative design, mail, and printing products and services . . .

> [W]illfully acquired and maintained its market power, in violation of the Sherman and Clayton Acts, 15 U.S.C. §§ 1 & 14, in the Timeshare Travel Package Direct Mail Market through anticompetitive conduct. Through the exertion of that market power, Defendants forced and coerced [Plaintiff] to sign the Agreement. By doing so, Defendants required that [Plaintiff] use only Defendants' creative design, mail and printing products and services, and prohibited

[Plaintiff's] use of the comparable, competitively priced products of Defendants' competitors.

(Dkt.49).

In Count I of Plaintiff's Amended Complaint, (Dkt.49), Plaintiff alleges that Defendants engaged in an illegal tying arrangement, in violation of 15 U.S.C. §§ 1, 2, and 14. Plaintiff states that Defendants possessed dominant market power, which included the power to exclude competition. According to Plaintiff, Defendants illegally required Plaintiff to exclusively contract with Defendants for creative design, mail, and printing products and services, in order to obtain Defendants' highly desirable lead lists. Plaintiff states that this illegal tying arrangement caused Plaintiff to suffer damages, and, in light thereof, requests three times the actual damages suffered.

In Count II of Plaintiff's Amended Complaint, Plaintiff alleges that Defendants violated 15 U.S.C. §§ 1 and 14, through their exclusive dealing arrangement. In connection with this allegation, Plaintiff states that Defendants possessed dominant market power, which was willfully acquired and maintained. Plaintiff states that it was coerced into signing the exclusive dealing contract, put forth by Defendants, in order to obtain the highly desirable lead lists held by Defendants. In connection with Count II, Plaintiff, again, requests three times the actual damages suffered.

On December 6, 1999, Defendants filed an Amended Counterclaim against Plaintiff. (Dkt.98). Count I of Defendants' Amended Counterclaim asserts that Plaintiff unlawfully, and without legal justification, conspired, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, with other similarly situated individuals or entities [hereinafter referred to as the "Co-op"] to boycott Defendants jointly and to drive Defendants out of business.

Count II of Defendants' Amended Counterclaim alleges that Plaintiff unlawfully, and without legal justification, conspired, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to fix the purchase price paid for Defendants' services at artificially low and non-competitive levels.

Count III of Defendants' Amended Counterclaim, which has been dismissed from this action, alleged violations of Florida Statute 501.204(1), also referred to as the Florida Unfair Competition and Deceptive Trade Practices Act. Count III asserted that Plaintiff induced individual customers of Defendants to: (1) fix jointly the purchase price paid for Defendants' services; (2) organize a group boycott of Defendants; (3) terminate their respective Sales and Marketing Agreements; (4) misappropriate Defendants' proprietary information; (5) interfere with Defendants' arrangements with mail list providers; (6) and interfere with Defendants' ability to provide response rates that Defendants guaranteed in Sales and Marketing Agreements entered into by Plaintiff and other "Co-op" members. Defendants stated that, as a result of Plaintiff's actions, Defendants have suffered irreparable injury in excess of twenty-nine million dollars.

Count IV of Defendants' Amended Counterclaim alleges a common-law conspiracy claim against Plaintiff. Defendants allege that Plaintiff, through "peculiar powers of coercion," used the "Co-op" for its own economic gain in pursuit of an unlawful scheme to: (1) fix the purchase price of Defendants' services; (2) boycott Defendants; (3) terminate the respective Sales and Marketing Agreements; (4) misappropriate Defendants' proprietary lists; (5) interfere with Defendants' arrangements with mail list providers; and (6) interfere with Defendants' ability to provide response rates that Defendants guaranteed in the Sales and Marketing Agree-

ments entered into with Plaintiff and other "Co-op" members. In connection with Count IV, Defendants allege entitlement to damages in excess of twenty-nine million dollars.

Count V of Defendants' Amended Counterclaim alleges that Plaintiff has interfered with Defendants' Sales and Marketing Agreements. Defendants allege that Plaintiff induced members of the "Co-op" to breach their respective Sales and Marketing Agreements, in the hope of providing "Co-op" members with a pretext for breach. Defendants further allege that Plaintiff persuaded "Co-op" members to breach the Sales and Marketing Agreements by stating that such a breach would render Defendants incapable of enforcing their contractual and statutory rights in the proprietary lists that Plaintiff intended to, and did in fact, misappropriate. In connection with this allegation, Defendants allege damages in the amount of ten million dollars.

Count VI of Defendants' Amended Counterclaim alleges misappropriation of proprietary information. Defendants allege that Plaintiff, by feigning interest in purchasing Defendants, induced Defendants' former President to breach his fiduciary obligations to Defendants, and by using other improper means, in violation of the Florida Uniform Trade Secrets Act, Florida Statutes §§ 688.001, *et seq.*, obtained from Defendants, lead lists, information concerning the source of lead lists, information concerning the techniques employed by Defendants to edit lead lists, sensitive financial data, and other information deemed confidential and proprietary by Defendants and constituting trade secrets. Defendants state that the information obtained by Plaintiff had independent economic value to · Defendants and that Defendants, at all times, took reasonable measures to maintain the confidentiality of the information allegedly misappropriated by Plaintiff.

Count VII of Defendants' Amended Counterclaim alleges that Plaintiff breached a Sales and Marketing Agreement that was entered into between Plaintiff and Defendants. Defendants state that they faithfully performed all of their obligations under the Sales and Marketing Agreements, except to the extent that they were excused from such performance by waiver. Defendants state that as a result of Plaintiff's breach of the Sales and Marketing Agreement, Defendants have suffered damages in the amount of two and one-half million dollars.

Count VIII of Defendants' Amended Counterclaim alleges that Plaintiff breached an additional printing obligation. Defendants state that Plaintiff was required to use Defendants for all of its additional printing and mailing needs associated with Plaintiff's travel related mailings. Defendants state that as a result of Plaintiff's breach of this printing obligation, Defendants have suffered an undetermined amount of damages.

Count IX of Defendants' Amended Counterclaim alleges that Plaintiff breached a non-solicitation agreement that was contained within the Sales and Marketing Agreements entered into between Plaintiff and Defendants. Defendants state that the non-solicitation agreement contained provisions that required Plaintiff and "Co-op" members to refrain from directly or indirectly obtaining or using lead lists or files in which the other party to the agreement has a position or has blanketed for future use. As a result of entering into the non-solicitation agreements, and breaching those agreements, Plaintiff is required, according to Defendants, to pay liquidated damages to Defendants in the amount of ten cents per name for the

gross number of names provided by the list source.

Count X of Defendants' Amended Counterclaim alleges that Plaintiff breached a provision of the Sales and Marketing Agreement by soliciting Defendants' employees. Defendants state that based on information and belief, Plaintiff violated the agreement not to solicit Defendants' employees during the term of the Sales and Marketing Agreement, and, therefore, Defendants are entitled to two and one-half million dollars.

On January 14, 2000, Plaintiff filed a Motion to Dismiss Amended Counterclaims of Defendant. (Dkt.102). Plaintiff sought dismissal of Counts I–VI of Defendants' Amended Counterclaim. After thoroughly considering the argument set forth in Plaintiff's Motion to Dismiss, the Court dismissed only Count III of Defendants' Amended Counterclaim.

## II. Summary Judgment

### A. Standard of Review

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue of material fact" since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of the case with respect to which that party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of genuine issues of material fact. *See id.* That burden of showing a basis for a motion can be discharged by "showing ... that there is an absence of evidence to support the non-moving party's case." *See id.* at 323, 325, 106 S.Ct. 2548.

Issues of fact are " 'genuine' only if a reasonable jury considering the evidence presented could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *See id.* at 248, 106 S.Ct. 2505. In determining whether a material fact exists, the court must consider all the evidence in a light most favorable to the nonmoving party. *See Sweat v. Miller Brewing Co.,* 708 F.2d 655, 656 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *See Hayden v. First Nat'l Bank of Mt. Pleasant,* 595 F.2d 994, 996–97 (5th Cir. 1979) (quoting *Gross v. Southern Ry. Co.,* 414 F.2d 292, 297 (5th Cir.1969)).

Although factual disputes preclude summary judgment, the "mere possibility that factual disputes may exist, without more, is not sufficient to overcome a convincing presentation by the party seeking summary judgment." *See Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). When a party's response consists of "nothing more than a

repetition of his conclusional allegations," summary judgment is not only proper but required. *Morris v. Ross,* 663 F.2d 1032, 1034 (11th Cir.1981).

### B. Discussion

On September 6, 2000, Plaintiff filed a Motion for Summary Judgment, and Memorandum in Support, with this Court. (Dkts.173, 174). On December 22, 2000, Plaintiff filed an Amended Memorandum in Support of Motion for Summary Judgment. (Dkt.207). Within Plaintiff's Motion for Summary Judgment, and the Memorandum submitted in support, Plaintiff asserts that summary judgment is warranted on the following grounds, which are not necessarily listed in the order Plaintiff addresses them within the motion:

1) Defendants' group boycott claims fail as the undisputed facts do not show the existence of a group boycott prohibited under Section 1 of the Sherman Antitrust Act;

2) Defendants' group boycott claims fail as the undisputed facts do not show the existence of a per se violation of Section 1 of the Sherman Antitrust Act;

3) Defendants' group boycott claims fail as Defendants have no standing to assert a claim based upon the alleged in inception group boycott;

4) Defendants' purchase price fixing claims fail as the undisputed facts do not show the existence of purchase price fixing prohibited under Section 1 of the Sherman Antitrust Act as a matter of law;

5) Defendants' purchase price fixing claims fail as the undisputed facts do not show the existence of a "combination or conspiracy" among purchasers to fix prices in violation of Section 1 of the Sherman Antitrust Act;

6) Defendants' purchase price fixing claims fail as the undisputed facts do not show the existence of a per se violation of Section 1 of the Sherman Antitrust Act;

7) Defendants' common law conspiracy claims fail as the undisputed facts do not show that the chosen purchasers of Defendants' self imposed reduced volume of vacation travel certificates possessed "peculiar powers of coercion which they would not otherwise be expected to exert" as a matter of law;

8) Defendants' interference with Sales and Marketing Agreements claims fail as the undisputed facts do not show an "intentional and unjustified interference" with Defendants' contractual relationships with its vacation travel certificate customers;

9) Defendants' interference with Sales and Marketing Agreements claims fail as the undisputed facts show that all actions taken by Plaintiff were economically privileged as a matter of law;

10) Defendants' misappropriation of proprietary information claim fails as there is a complete absence of admissible evidence to support this claim;

11) Defendants' breach of Sales and Marketing Agreements claim fails because Plaintiff was excused from performing due to Defendants' breach of the agreements by utilizing mailing lists not targeted to people who had credit cards such as Master Card or Visa in violation of paragraph 7, failing to achieve a 5% response rate as guaranteed in paragraph 7, failing to adjust the Initial Standard Price on a monthly basis as required by paragraph 12, and failing to release the audit required by paragraph 13;

12) Defendants' breach of additional printing obligations claim fails because there is a complete lack of admissible evidence to support this claim;

13) Defendants' breach of non-solicitation obligation claims fail because there is

a complete absence of admissible evidence to support this claim; and,

14) Defendants' request for punitive damages is not supported by the facts.

### 1) Count I–Group Boycott

In support of summary judgment, Plaintiff states that Count I of Defendants' Amended Counterclaim, alleging a group boycott, fails because the undisputed facts do not show the existence of a group boycott, or a per se violation, of Section 1 of the Sherman Antitrust Act and Defendants have no standing.

### A) Standing

▮ In order to successfully plead an antitrust case, antitrust standing must be proven. Antitrust standing differs from the "injury in fact" and the "case or controversy" requirements under Article III of the United States Constitution. *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir.1991). When analyzing whether a antitrust standing exists, the court is required to analyze the issues under two distinct prongs. The first prong required to establish antitrust standing, is the requirement of an antitrust injury. *See Municipal Utils. Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1499 (11th Cir.1991). To have an antitrust injury, a plaintiff "must prove more than injury casually linked to an illegal presence in the market [i.e., but for causation]. Plaintiffs must prove antitrust injury, which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

The second prong that the plaintiff must establish, is that the plaintiff is an efficient enforcer of the antitrust laws. *See Municipal Utils. Bd. of Albertville*, 934 F.2d at 1499. In order to determine if a plaintiff is an efficient enforcer of the antitrust laws, the court must apply the "target area test." *Austin v. Blue Cross and Blue Shield of Ala.*, 903 F.2d 1385, 1388 (11th Cir.1990). To satisfy the "target area test" a plaintiff must "prove that [the plaintiff] is within that sector of the economy endangered by a breakdown of competitive conditions in a particular industry" and that the plaintiff is "the target against which anticompetitive activity is directed." *National Indep. Theatre Exhibitors, Inc. v. Buena Vista Dist. Co.*, 748 F.2d 602, 608 (11th Cir.1984). In other, more simple, terms, the plaintiff must prove that the plaintiff is a "customer or competitor in the relevant antitrust market." *Florida Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir.1997)(citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

In support of the claim that Defendants have no standing to assert a group boycott claim, Plaintiff states that the "Co-op" was a vertical arrangement that allowed for Defendants unilaterally and voluntarily to decline to sell to the "Co-op's" competitors. As a result of this unilateral and voluntary right to deny, it is clear, according to Plaintiff, that Defendants created the plan in question, Defendants created the "Co-op", and under the law, only competing travel sellers, not Defendants, have standing to complain. Plaintiff supports this argument by stating that Defendants are not the category of claimants for whom that antitrust laws were intended to protect.

▮ After completely reviewing Plaintiff's allegations regarding Defendants' standing, the Court finds that Defendants have satisfied, to the extent necessary to avoid summary judgment, the existence of

antitrust standing. Defendants have provided the Court with sufficient evidence to show the existence of an antitrust injury and that Defendants are an efficient enforcer of the antitrust laws. (Dkt.171, Exhibits A, P, U; Dkt. 178, Exhibits BB, CC, DD).

### B) Group Boycott and Per Se Analysis

In a traditional group boycott, individuals on one side of a distribution setting attempt to exclude competitors, or potential competitors, by taking agreed action to deprive the competitors of a relationship necessary to compete. *See Southway Theatres, Inc. v. Georgia Theatre Co.*, 672 F.2d 485 (5th Cir.1982); *see also Langston Corp. v. Standard Register Co.*, 553 F.Supp. 632, 638 (N.D.Ga.1982). In a typical group boycott, a group of individuals that normally act as competitors of each other form an alliance and attempt to have the supplier used by other competitor entities boycott those competitor entities, many times by placing, or threatening to place, an economic burden on the supplier. *See United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Fashion Originators' Guild of America v. FTC*, 312 U.S. 457, 312 U.S. 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941); *Eastern States Retail Lumber Dealers' Assoc. v. United States*, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

Group boycotts have both horizontal and vertical characteristics. *See Langston Corp.*, 553 F.Supp. at 638. Group boycotts may involve individuals and entities at different levels of the market and may affect individuals and entities at the same level. *See id.*

In support of Plaintiff's Motion for Summary Judgment, Plaintiff states that Defendants' allegations concerning a per se group boycott fail both when the group boycott claims are considered at the time of the alleged inception, and at the time the alleged group boycott was terminated. In support of this theory, Plaintiff states that the Eleventh Circuit cautions against the use of a per se analysis and the resulting "haphazard expansion of the 'group boycott label.'" (Dkt.174)(citing *Retina Associates, P.A. v. Southern Baptist Hospital of Florida, Inc.*, 105 F.3d 1376 (11th Cir.1997)). Plaintiff alleges that every component of the alleged group boycott in inception, was originated by Defendant. As for the alleged group boycott in termination, Plaintiff states that any alleged refusal to deal with Defendant was caused by Defendants' failure to comply with contractual requirements entered between Plaintiff and Defendants.

There are two manners in which a Court can analyze an antitrust case: 1) a rule of reason analysis; or, 2) a per se analysis. *See Metzler*, 19 F.Supp.2d at 1360. While most antitrust claims are analyzed under the rule of reason standard, some actions pose such a habitual unacceptable risk of restraining trade that they are unreasonable per se. *See id.*

■ Under the rule of reason standard, the trier of fact must decide whether the actions alleged to be in violation of the antitrust laws "impose an unreasonable restraint on competition." *Id.* (citing *Southern Card & Novelty, Inc.*, 138 F.3d at 874). When determining whether actions are in violation of the Sherman Act, a court may consider a variety of factors, including: 1) "specific information about the relevant business"; 2) "its condition before and after the restraint was imposed"; and, 3) "the restraints history, nature, and effect." *Id.* (citing *Southern Card & Novelty, Inc.*, 138 F.3d at 874).

■ The per se rule, in the Eleventh Circuit, is applied with great caution. *See Southern Card & Novelty, Inc.*, 138 F.3d at 874; *Retina Assocs., P.A. v. Southern Baptist Hosp. of Fla., Inc.*, 105 F.3d 1376,

1381 (11th Cir.1997). The Eleventh Circuit tends to apply the per se rule only when previous experience dictates that the rule of reason will predictably indicate that the actions are in restraint of competition. *See id.*

 As Defendants allege only that Plaintiff's actions in furtherance of the alleged group boycott are per se violations of the Sherman Act, this Court will only analyze Count I of Defendants' Amended Counterclaim under the per se approach. To determine whether an action violates the Sherman Act, a court must determine whether the actions are an unreasonable restraint on trade. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 289, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202 (1985). In order to be considered a per se violation of the Sherman Act, actions must be found to consist of "Agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Courts, through the use of the per se analysis, are permitted to make "categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive," and by doing so, "can thereby avoid the 'significant costs' in 'business certainty and litigation efficiency' that a full-fledged rule-of-reason inquiry entails." *Northwest Wholesale Stationers, Inc.*, 472 U.S. at 289, 105 S.Ct. 2613 (citing *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 343–344, 102 S.Ct. 2466, 2472–2473, 73 L.Ed.2d 48 (1982)).

In Count I of Defendants' Amended Counterclaim, Defendants allege that Plaintiff conspired to boycott Defendants and to drive Defendants out of business in furtherance of its scheme to allocate customers and to otherwise eliminate competition in the sale of vacation travel certificates. (Dkt.98). Defendants allege that the purpose of the conspiracy to boycott Defendants was to fix the prices paid for Defendants' services at an artificially low level, to eliminate competition, to misappropriate Defendants' proprietary mail lists in order to perfect their per se unlawful customer allocation scheme, and to drive Defendants out of business. In furtherance of this alleged conspiracy to boycott, Defendants allege that Plaintiff jointly fixed the purchase price paid for Defendants' services, terminated their Sales and Marketing Agreements with Defendants, sought to enlist others to join the alleged conspiracy, misappropriated Defendants' trade secrets, and interfered with Defendants' rights to lead lists. (Dkt.98).

In response to Plaintiff's Motion for Summary Judgment, Defendants state that the allegations contained within Count I of Defendants' Amended Counterclaim do not relate to contract integration, therefore, the per se rule analysis is proper, and that the record of this case shows a naked restraint on trade, subject to the per se analysis.

 After thoroughly reviewing the record of this case, this Court finds that Plaintiff's Motion for Summary Judgment, as to Count I of Defendants' Amended Counterclaim, must be denied. Defendants have submitted sufficient evidence to show that a genuine issue of material fact exists as to whether Plaintiff engaged in a per se group boycott of Defendants. (Dkt. 171, Exhibits A, P, U; Dkt. 178, Exhibits BB, CC, DD). While the Court recognizes that the Eleventh Circuit cautions against expanding the use of the per se analysis,

the Court finds that the allegations contained within Defendants' Amended Counterclaims do not, at this stage of litigation, expand such a use.

### 2) Count II–Purchase Price Fixing

In support of Plaintiff's Motion for Summary Judgment as to Count II, Plaintiff states that the undisputed facts do not show the existence of purchase price fixing, the existence of a combination or conspiracy, or a per se violation of Section 1 of the Sherman Antitrust Act. (Dkt.173).

In Count II of the Amended Counterclaim, Defendants allege that Plaintiff, in combination with others has "unlawfully and without legal justification conspired in violation of Section I of the Sherman Act, 15 U.S.C. § 1, to fix jointly the purchase price paid by "Co-op" members for [Defendants'] services at artificially low and noncompetitive purchase prices." (Dkt.98). Defendants state, in response to Plaintiff's Motion for Summary Judgment, that Plaintiff attempted in 1995, to force Defendants to accept a deal that would require Defendants to make all of their mailing services and capacity available to Plaintiff, thereby, excluding all of Defendants' other customers. After many attempts to handle the alleged demands, Plaintiff's marketing director, allegedly, conveyed to Defendants that Plaintiff had formed a "Co-op," and that the price the "Co-op" members would pay Defendants for their services was cost plus ten (10) cents, that mailings would have to be limited to 1.1 million pieces per week, that there would have to be a "response rate guarantee," that Defendants were required to deal with the "Co-op" members as a group, and that Defendants leads would be split up among the "Co-op" members. (Dkt.177).

■ Having considered the entire record of this case, including the evidence submitted, the Court finds that Defendants have alleged and provided sufficient supporting evidence to avoid the entry of summary judgment as to Count II. Defendants have shown sufficient evidence to establish the existence of a "Co-op," and the agreements to illegally fix the purchase prices paid by those "Co-op" members to Defendants. (Dkt. 171, Exhibits A. P, U; Dkt. 178, Exhibits BB, CC, DD).

### 3). Count IV–Common Law Conspiracy

In support of the entry of summary judgment, as to Count IV, Plaintiff states that the undisputed facts do not show that the chosen purchasers of Defendants' self-imposed reduced volume of vacation travel certificates possessed "peculiar powers of coercion which they would not otherwise be expected to exert" as a matter of law. (Dkt.173).

Count IV of Defendants' Amended Counterclaim alleges common law conspiracy against Plaintiff. Defendants state that Plaintiff has, along with other individuals, created a combination and conspiracy with peculiar powers of coercion. Defendants state that Plaintiff, and the other members of the common law conspiracy, used the conspiracy's peculiar powers of coercion for their own economic gain. Defendants claim that the conspiracy pursued the unlawful scheme to fix the purchase price of Defendants' services, misappropriate Defendants' proprietary lists, and to render Defendants incapable of enforcing their rights in said lists by forcing Defendants out of business.

■ Under Florida law, a civil action exists "where any combination of two or more persons to commit an unlawful act, or to commit a lawful act by unlawful means, results in private injury." *Regan v. Davis*, 97 So.2d 324, 326 (Fla. 2nd DCA 1957). A case of conspiracy exists for:

any combination to commit any offense.

However, the scope of the action is much

broader than this, for under the common law it includes combinations to commit crimes, torts or any other wrongs which cause private injuries to individuals. It may be said generally that a civil action will lie where any combination of two or more persons to commit an unlawful act, or to commit a lawful act by unlawful means, results in private injury. The Florida court has recognized conspiracy as a separate tort for which the person injured may sue all or any one or more conspirators.

*Id.* (internal quotations omitted).

 After reviewing the pleadings, and evidence, relating to Count IV of Defendants' Amended Counterclaim, the Court finds that summary judgment is not warranted. While Plaintiff states that Plaintiff did not conspire against Defendants, and did not possess peculiar powers of coercion, Defendants have provided sufficient evidence stating otherwise. Specifically, Defendants allege, and provide evidence in support, that Plaintiff engaged in a conspiracy that possessed peculiar powers of coercion. (Dkt. 171, Exhibits A, P, U; Dkt. 178, Exhibits BB, CC, DD). Defendants state, and provide sufficient supporting evidence, that Plaintiff used the conspiracy for its own economic gain in pursuit of unlawful schemes to fix the purchase price of Defendants' services, allocate customers, misappropriate Defendants' proprietary lists, and to force Defendants out of business. (Dkt. 171, Exhibits A, M, P, U; Dkt. 178, Exhibits BB, CC, DD). This information adequately establishes, to avoid the entry of summary judgment, the existence of a an independent tort for conspiracy, under Florida law. As such, Plaintiff's Motion for Summary Judgment, as to Count IV of Defendants' Amended Counterclaim, must be denied.

### 4. Count V–Interference with Sales and Marketing Agreements

In Count V of Defendants' Amended Counterclaim, Defendants assert that Plaintiff interfered with Sales and Marketing Agreements. Defendants state that Plaintiff intentionally, maliciously, without justification, with knowledge of their existence, and in furtherance of Plaintiff's scheme to eliminate competition among the "Co-op" members, encouraged individuals and entities to breach their Sales and Marketing Agreements.

Plaintiff states that summary judgment is warranted as to Count V of Defendants' Amended Counterclaim because Defendants breached the Sales and Marketing Agreements. (Dkt.207). Since, according to Plaintiff, Defendants breached the Sales and Marketing Agreements, Plaintiff claims that Plaintiff could not have unjustifiably interfered with those agreements.

 To establish the existence of a tortuous interference with a contractual relationship, it must be shown that: (1) an advantageous business relationship exists; (2) that the business relationship provided the injured party with legal rights; (3) that a party to the advantageous business relationship intentionally and unjustifiably interfered with that advantageous business relationship; and, (4) the injured party suffered damages as a result of the intentional and unjustified interference. *See Wackenhut Corp. v. Maimone,* 389 So.2d 656, 657 (Fla. 4th DCA 1980)(confirming the holding in *Lake Gateway Motor Inn v. Matt's Sunshine Gift Shops, Inc.,* 361 So.2d 769 (Fla. 4th DCA 1978)).

 Defendants allege, and provide sufficient evidentiary support, to avoid the entry of summary judgment on Count V of Defendants' Amended Counterclaim. Defendants have provided this Court with sufficient evidence that: (1) Plaintiff, De-

fendants, and other "Co-op" members, entered into an advantageous business relationship, through the Sales and Marketing Agreements; (2) that the business relationship, or Sales and Marketing Agreements provided Defendants with legal rights; (3) that Plaintiff intentionally and unjustifiably interfered with that advantageous business relationship; and (4) Defendants were damaged as a result of Plaintiff's action. (Dkt. 171, Exhibits A, H, M, P, U; Dkt. 176, Exhibits 2, 3, 5, 6, 8, 9, 11, 14A, 43, 44, 49–51, 54, 60, 63, 67–72, 76–78, 87; Dkt. 178, Exhibits BB, CC, DD, FF). As such, Plaintiff's Motion for Summary Judgment as to Count V of Defendants' Amended Counterclaim must be denied.

### 5) *Count VI–Misappropriation of Proprietary Information*

Count VI of Defendants' Amended Counterclaim alleges that Plaintiff misappropriated proprietary information. Defendants state that Plaintiff, by feigning interest in purchasing Defendants, obtained lead lists, information concerning the source of lead lists, information concerning the techniques used by Defendants to edit the lead lists, sensitive financial data, and other information deemed confidential and proprietary by Defendants and constituting trade secrets within the meaning of Florida Statutes §§ 688.001, et seq. (Dkts.177, 212).

According to Plaintiff, summary judgment should be entered as to Count VI of Defendants' Amended Counterclaim because Defendants have failed to identify anything entitled to protection as a trade secret. Plaintiff states that Defendants appear to rest their entire argument as to misappropriation of information on lead lists that were purchased by Defendants from Trans Union. Plaintiff states that because Defendants failed to pay Trans Union for the use of those lead lists, Defendants lost, at their own hand, the use of

the lead lists in question. (Dkts.173, 174, 207).

In response to Plaintiff's Motion for Summary Judgment, Defendants state that evidence showing that Plaintiff feigned interest in purchasing Defendants' and that Plaintiff obtained critical information about Defendants' methods of selecting lead lists for mailing. Defendants state that, in particular, two confidentiality agreements entered into by Plaintiff show Plaintiff's knowledge that the information it was obtaining pursuant to its alleged interest in purchasing Defendants', was secret information. (Dkts.177, 212).

Under Florida law, misappropriation is defined as:

(a) Acquisition of a trade secret of another person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(1) Used improper means to acquire knowledge of the trade secret; or

(2) At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

a. Derived from or through a person who had utilized improper means to acquire it;

b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(3) Before a material change of her or his position, knew or had reason to know that it was a trade secret and that

knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).

In support of Count VI of the Amended Counterclaim, Defendants state, and submit evidence to show, to the extent necessary to avoid the entry of summary judgment, that Plaintiff recognized the secret nature of the information it obtained as a result of its stated interest in purchasing Defendants. (Dkt. 178, Exhibit BB). Further, sufficient evidence exists, within the record of this case, to show the existence of a genuine issue of material fact as to whether the information obtained by Plaintiff was a trade secret under Florida law. (Dkt. 171, Exhibits A, P, U; Dkt. 178, Exhibits BB, CC, DD). Defendants do not merely rely on Plaintiff's alleged receipt of the lead lists, to support the misappropriation claim contained in Count VI, Defendants also state, and provide sufficient evidence to support, that Plaintiff obtained information related to the techniques used by Defendants to edit these lead lists, sensitive financial data, and information concerning the source of these lead lists. (Dkt. 171, Exhibits A, P, U; Dkt. 178, Exhibits BB, CC, DD). As a genuine issue of material fact exists as to whether Plaintiff misappropriated Defendants' proprietary information under the Florida Uniform Trade Secrets Act, this Court must deny Plaintiff's Motion for Summary Judgment as to Count VI.

6. *Count VII–Breach of Sales and Marketing Agreement;*

In Count VII of Defendants' Amended Counterclaims, Defendants state that Plaintiff entered into a Sales and Marketing Agreement with Defendants on November 17, 1995, for a period of five (5) years. Under the terms of that Sales and Marketing Agreement, according to Defendants, Plaintiff was obligated to purchase from Defendants 400,000 mail pieces each week for the duration of the contract, at cost, as defined in the agreement, plus ten cents per mail piece. Defendants state that Defendants performed all obligations required of Defendants under the Sales and Marketing Agreement, except to the extent that Defendants were excused from performance by waiver, by Plaintiff's breach, and by Plaintiff's interference with Defendants' ability to perform. According to Defendants, even though Defendants faithfully complied with the obligations contained in the Sales and Marketing Agreement, Plaintiff, without cause, terminated the agreement. Defendants claim to have suffered damages in the amount of $2,500,000.00, as a result of Plaintiff's breach.

Plaintiff states, within the Motion for Summary Judgment, that summary judgment is appropriate because Plaintiff was excused from performing the obligations contained in the Sales and Marketing Agreement because Defendants breached the Sales and Marketing Agreement. Plaintiff states that Defendants breached the Sales and Marketing Agreement by: (a) utilizing mailing lists not targeted to people who had credit cards such as Master Card or Visa, in violation of paragraph seven of the agreement; (b) failing to achieve a five percent response rate, as guaranteed in paragraph seven of the agreement; (c) failing to adjust the Initial Standard Price on a monthly basis, as required by paragraph twelve of the agreement; and, (d) failing to release the audit, as required by paragraph thirteen of the agreement. As, according to Plaintiff, Defendants breached the Sales and Marketing Agreement, Plaintiff was excused from performing the obligations contained within the agreement.

Under Florida law, when factual issues exist, as to "whether a contract was breached, and if so, by whom," summary judgment is not proper. *Delcoco v. Maxi,*

*Inc.*, 428 So.2d 374 (Fla. 5th DCA 1983). After thoroughly reviewing the record of this case, the Court finds that sufficient evidence exists to create a genuine issue of material fact as to which party, or parties, breached the Sales and Marketing Agreement. (Dkt. 171, Exhibits A, H, M, P, U; Dkt. 176, Exhibits 2, 3, 5, 6, 8, 9, 11, 14A, 43, 44, 49–51, 54, 60, 63, 67–72, 76–78, 87; Dkt. 178, Exhibits BB, CC, DD, FF). As a genuine issue of material fact exists, as to which party, or parties, breached the agreement, summary judgment is not proper.

### 7. *Count VIII–Breach of Additional Printing Obligation*

In Count VIII of Defendants' Amended Counterclaim, Defendants assert that Plaintiff further breached the Sales and Marketing Agreement by failing to provide Defendants with printing and mailing services on all of Plaintiffs other vacation travel-related mailings promoting the sale of vacation travel certificates, as was required by paragraph four of the agreement. Defendants state that as a result of Plaintiff's further breach, Defendants suffered damages in a yet undetermined amount.

In Plaintiff's Motion for Summary Judgment, Plaintiff states that summary judgment is warranted because a complete lack of evidence exists to support Defendants' assertions regarding any breach or further breach of the Sales and Marketing Agreement. Plaintiff states that beyond the contract itself, Defendants must demonstrate admissible evidence to support the assertion that Plaintiff further breached the Sales and Marketing Agreement. Plaintiff states that the record is completely devoid of evidence to support Count VIII of Defendants' Amended Counterclaim.

The Court finds, after thorough review of the record, that Plaintiff's Motion for Summary Judgment, as to Count VIII, is not well taken. Defendants have submitted sufficient evidence to support the allegations that Plaintiff further breached the Sales and Marketing Agreement by failing to use Defendants for additional printing and mailing services. (Dkt. 178, Exhibits BB, KK). Further, as this Court previously stated, issues, in the case at hand, relating to whether a party or parties breached a contract, are issues of fact. *See Delcoco v. Maxi, Inc.*, 428 So.2d 374 (Fla. 5th DCA 1983). As genuine issues of material fact exist, as to Count VIII of Defendants' Amended Counterclaim, Plaintiff's Motion for Summary Judgment must be denied, as to Count VIII.

### 8. *Count IX–Breach of Non–Solicitation Obligation*

Defendants state, within Count IX of the Amended Counterclaims, that Plaintiff breached the Sales and Marketing Agreement by breaching the non-solicitation obligation contained within such agreement. Defendants state that Plaintiff agreed in paragraph seventeen of the agreement, to not, directly or indirectly, obtain or use lead lists or files in which the other party to the particular agreement has a position or has blanketed for future use. This obligation, according to Defendants, extended to any list that either party subsequently used on a test basis or blanketed for future use. Defendants state that within an addendum to the Sales and Marketing Agreement, Plaintiff agreed to abide by the non-solicitation obligation contained within the Sales and Marketing Agreement for a period of one year after the termination of the agreement without regard to the reason for termination.

Plaintiff's Motion for Summary Judgment states that summary judgment is warranted because a complete lack of evidence exists to support Defendants' assertions. Plaintiff states that the lead list at

issue, the Trans Union new credit card issue lead list, was not obtained by Plaintiff at the expense of Defendants. Plaintiff states that Trans Union made the business decision to award the future rights to use the lead list at issue to a competitor of Defendants, because Defendants failed to pay for the lists in a timely manner. Plaintiff also asserts that Defendants did not blanket the Trans Union lead list for future use, because the decision to blanket the list was made on a week-by-week basis, and was based on Defendants timely ordering of the list, and timely payment for the list.

In response to Plaintiff's Motion for Summary Judgment, Defendants state that Plaintiff is correct to state that Defendants did not have any "continuing right ... in future rentals of such lead lists...." (Dkt.177) Defendants point out, however, that the parties agreed, within the Sales and Marketing Agreement and the addendum thereto, that the parties would refrain from soliciting each other's lead lists, and that through the actions of Plaintiff's cartel, Plaintiff eliminated Defendants, making Defendants unable to provide payment for the lead lists.

After reviewing the record, the Court finds that Plaintiff's Motion for Summary Judgment must be denied as to Count IX. Defendants have submitted sufficient evidence to create a genuine issue of material fact as to whether the Sales and Marketing Agreement was breached, and if so, by whom the agreement was breached. (Dkt. 171, Exhibit A, H; Dkt. 178, Exhibits BB, KK). As such, the Court finds that Plaintiff's Motion for Summary Judgment, as to Count IX, must be denied.

9. *Count X—Breach of Employee Non-Solicitation Obligation*

Count X of Defendants' Amended Counterclaim states that Plaintiff agreed within the Sales and Marketing Agreement to avoid soliciting Defendants' for employment purposes during the term of the Sales and Marketing Agreement, and for a term of one year following the termination of such agreement.

Defendants, within the Response to Plaintiff's Motion for Summary Judgment, do not dispute Plaintiff's allegations concerning the lack of evidence to support the entry of summary judgment as to Count X of Defendants' Amended Counterclaim and, in fact, agree that Count X should be dismissed from this action. (Dkt.177). As such, this Court will not address Count X of Defendants' Amended Counterclaim, and finds, after reviewing the record of this case, that the entry of summary judgment, as to Count X, is warranted. Accordingly, it is

**ORDERED** that Plaintiff's Motion for Summary Judgment, (Dkt.173), be **GRANTED**, as to Count X of Defendants' Amended Counterclaim, (Dkt.98), and be **DENIED** as to all other Counts.